℀JS 44   (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

ROSLYNN SIMMONS

## DEFENDANTS

COMMUNITY EDUCATION CENTERS, INC. (a/k/a GEORGE W. HILL CORRECTION FACILITY OR DELAWARE COUNTY PRISON

**(b)** County of Residence of First Listed Plaintiff   Delaware, PA
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Essex, NJ
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Stewart C. Crawford, Jr., Esquire,
55 North Lansdowne Avenue, Lansdowne, PA 19050

Attorneys (If Known)
John P. Gonzales, Esquire, 2000 Market Street, 23rd Floor,
Phila., PA 19103

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1   U.S. Government Plaintiff

☒ 3   Federal Question (U.S. Government Not a Party)

☐ 2   U.S. Government Defendant

☐ 4   Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)   and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☒ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN   (Place an "X" in One Box Only)

☐ 1 Original Proceeding   ☒ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**):
29 U.S.C §185(a), 28 U.S.C. Section 1332
Brief description of cause:
Section 301 of the Labor Management Relations Act

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ 75,000.00   CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE
02/24/2015

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

FOR THE EASTERN DISTRICT OF PENNSYLVANIA – DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff      310 Maypole Road, Upper Darby, Pennsylvania 19082

Address of Defendant      35 Fairfield Place, West Caldwell, NJ 07006

Place of Accident, Incident or Transaction      500 Cheney Road, Thornton, PA 19373
*(Use Reverse Side for Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))    Yes ☐   No ☒

Does this case involve multidistrict litigation possibilities?    Yes ☐   No ☒

*RELATED CASE, IF ANY:*

Case Number: _____    Judge _____    Date Terminated _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
   Yes ☐   No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
   Yes ☐   No ☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier number case pending or within one year previously terminated action in this court?
   Yes ☐   No ☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
   Yes ☐   No ☒

CIVIL: (Place ✓ in ONE CATEGORY ONLY)

| A. | *Federal Question Cases:* | B. | *Diversity Jurisdiction Cases* |
|---|---|---|---|
| 1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts | | 1. ☐ Insurance Contract and Other Contracts |
| 2. ☐ FELA | | 2. ☐ Airplane Personal Injury |
| 3. ☐ Jones Act-Personal Injury | | 3. ☐ Assault, Defamation |
| 4. ☐ Antitrust | | 4. ☐ Marine Personal Injury |
| 5. ☐ Patent | | 5. ☐ Motor Vehicle Personal Injury |
| 6. ☒ Labor-Management Relations | | 6. ☐ Other Personal Injury (Please specify) |
| 7. ☐ Civil Rights | | 7. ☐ Products Liability |
| 8. ☐ Habeas Corpus | | 8. ☐ Products Liability – Asbestos |
| 9. ☐ Securities Act(s) Cases | | 9. ☐ All other Diversity Cases |
| 10. ☐ Social Security Review Cases | | (Please specify) |
| 11. ☐ All other Federal Question Cases | | |
| (Please specify) | | |

## ARBITRATION CERTIFICATION
*(Check appropriate Category)*

I, John P. Gonzales, counsel of record do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE   2/24/15     _____ John P. Gonzales, Esquire _____     71265 _____
                                 Attorney-at-Law                              Attorney I.D. #

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE   2/24/15     _____ John P. Gonzales, Esquire _____     71265 _____
                                 Attorney-at-Law                              Attorney I.D. #

CIV. 609 (6/08)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

## CASE MANAGEMENT TRACK DESIGNATION FORM

**ROSLYNN SIMMONS**

**v.**                                                          **CIVIL ACTION NO.:**

**COMMUNITY EDUCATION CENTERS,
INC. (a/k/a GEORGE W. HILL
CORRECTIONAL FACILITY or
DELAWARE COUNTY PRISON**

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)   In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a)    Habeas Corpus-Cases brought under 28 U.S.C. §2241 through §2255.                    ( )

(b)    Social Security-Cases requesting review of a decision of the Secretary of Health
        and Human Services denying plaintiff Social Security Benefits.                                ( )

(c)    Arbitration-Cases require to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d)    Asbestos-Cases involving claims for personal injury or property damage from
        exposure to asbestos.                                                                                        ( )

(e)    Special Management-Cases that do not fall into tracks (a) through (d) that are
        commonly referred to as complex and that need special or intense management by
        the court.  (See reverse side of this form for a detailed explanation of special
        management cases.)                                                                                           ( )

(f)    Standard Management--Cases that do not fall into any one of the other tracks.          (X)

| February 24, 2015 | _John P. Gonzales, Esquire_ | Defendant, Community Education Centers, Inc. |
|---|---|---|
| Date | Attorney-at-law | Attorney for |
| | John P. Gonzales, Esquire | |

jpgonzales@mdwcg.com

| (215) 575-2871 | (215) 575-0856 | |
|---|---|---|
| Telephone | FAX Number | E-Mail Address |

(Civ. 660)  10/02

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROSLYNN SIMMONS | : | |
| | : | |
| vs. | : | Civil Action No. |
| | : | |
| COMMUNITY EDUCATION | : | |
| CENTERS, INC. (a/k/a GEORGE W. | : | |
| HILL CORRECTIONAL FACILITY or | : | |
| DELAWARE COUNTY PRISON) | : | |

| | | |
|---|---|---|
| ROSLYNN SIMMONS | : | COURT OF COMMON PLEAS |
| | : | DELAWARE COUNTY |
| vs. | : | |
| | : | Civil Action No. 15-886 |
| COMMUNITY EDUCATION | : | |
| CENTERS, INC. (a/k/a GEORGE W. | : | |
| HILL CORRECTIONAL FACILITY or | : | |
| DELAWARE COUNTY PRISON) | : | |

## NOTICE OF REMOVAL

TO THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA:

Defendant, Community Education Centers, Inc., by and through its attorneys, Marshall

Dennehey Warner Coleman & Goggin, hereby removes the above-captioned case to this

Honorable Court and provides notice of same to counsel representing the Plaintiff.  In support of

the removal, Defendant avers as follows:

1.      On January 30, 2015, Plaintiff, Roslynn Simmons filed a complaint in the Court

of Common Pleas of Delaware County, Pennsylvania against Defendant Community Education

Centers, Inc., styled: ***Roslynn Simmons  v. Defendant Community Education Centers, Inc***

***(a/k/a George W. Hill Correctional Facility or Delaware County Prison)***, Civil Action No. 15-

886.  Plaintiff's Complaint is attached hereto as Exhibit "1."

2.      Defendant was served with Plaintiff's Complaint on February 2, 2015.

3.      As Defendant was served on February 2, 2015, Defendant has not yet filed an Answer or other response to the Complaint.  In filing this Notice of Removal, Defendant does not waive any defense or counterclaim that may be available to it.

4.      This Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b) because it is filed within thirty (30) days of February 2, 2015, when Defendant was served with the Complaint.

5.      Counts II, III and IV of Plaintiff's Complaint allege that Defendant breached the collective bargaining agreement ("CBA"). *See* Ex. 1, at ¶¶ 128-139. The CBA is a contract within the meaning of Section 301 of the Labor Management Relations Act, 29 U.S.C §185(a) ("LMRA"). *See Retail Clerks International Association v. Lion Dry Goods*, 369 U.S. 178, 28-29 (1962).

6.      Because this action seeks relief for a claim arising through a contract under Section 301 of the LMRA, this matter is a civil action over which this Court has original jurisdiction under the provisions of 28 U.S.C. §§ 1331,1337. *Avco Corp, v. Aero Lodge No. 735, International Association of Machinists and Aerospace Workers*, 390 U.S. 557, 550 (1968).

7.      Accordingly, this Court has original jurisdiction over this civil action pursuant to 28 U.S.C. § 1331, and the action may be removed to this Court by Defendant pursuant to 28 U.S.C. § 1441.  The allegations set forth in the Complaint render this action a civil action arising under the Constitution, laws or treatises of the United States.

8.      This Honorable Court's jurisdiction is also based upon diversity of citizenship under 28 U.S.C. § 1332.

9.      Federal courts have original diversity jurisdiction over actions in which the matter in controversy exceeds seventy-five thousand dollars ($75,000.00) and the parties are citizens of different states.  28 U.S.C. § 1332.

10.      "A district court's determination as to the amount in controversy must be based on the 'plaintiff's complaint at the time [the] petition for removal was filed,'" *Werwinski v. Ford Co.*, 286 F.3d 661, 666 (3d Cir. 2002) (quoting *Steel Valley Auth. v. Union Switch & Signal*, 809 F2d 1006, 1010 (3d Cir. 1987).

11.      Plaintiff demands judgment in excess of $75,000 in her complaint.

12.      "Section 1332 has been interpreted to require 'complete diversity.'"  *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 580 n. 2 (1999).  Thus, diversity jurisdiction "applies only to cases in which the citizenship of each plaintiff is diverse from the citizenship of each defendant. *Caterpillar, Inc. v. Lewis*, 519 U.S. 61, 68 (1996).

13.      Here, Plaintiff resides at 310 Maypole Road, Upper Darby, Pennsylvania 19082.  *See* Ex. 1, at ¶1.

14.      Defendant CEC is a corporation organized and existing under the laws of the State of Delaware, with its registered address at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808. Affirmation of Paul Mazer, Esquire is attached hereto as Exhibit "2."

15.      Defendant CEC's principal place of business is in New Jersey, specifically 35 Fairfield Place, West Caldwell, New Jersey 07006. *See* Ex. 1, at ¶2; Ex. 2.

16.      Accordingly, there is complete diversity of all parties to the action.

17.      Written notice of this filing will be given to Plaintiff.  Also, as required by 28 U.S.C. § 1446(d), a copy of this Notice of Removal will also be filed with the Prothonotary of

the Court of Common Pleas of Delaware County, Pennsylvania, the court in which the State

Court Action was filed.

WHEREFORE, Defendant, Community Education Centers, Inc.,  respectfully requests

that the above action, now pending in the Court of Common Pleas of Delaware County,

Pennsylvania, be removed therefrom and proceed in this Court as an action duly removed.


**MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN**


BY:     *s/ John P. Gonzales*
       JOHN P. GONZALES, ESQUIRE
       Marshall, Dennehey, Warner, Coleman & Goggin
       2000 Market Street
       Philadelphia, PA 19131
       (215) 575-2871 (p)
       (215) 575- 0856 (f)
       *Attorney for Defendant*


DATE:  February 24, 2015

- 4 -

## CERTIFICATE OF SERVICE

I, JOHN P. GONZALES, ESQUIRE, do hereby certify that a true and correct copy of

Defendant's Notice of Removal was served upon opposing counsel by U.S. Mail at the following

address:

Stewart C. Crawford, Jr.
Law Offices of Stewart C. Crawford &Associates
55 N. Lansdowne Avenue
Lansdowne, PA 19050


**MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN**

BY:   */s/John P. Gonzales*
JOHN P. GONZALES, ESQUIRE
Attorney for Defendant


DATE:  February 24, 2015

THE LAW OFFICES OF STEWART C. CRAWFORD & ASSOCIATES
doing business as CRAWFORD LAW
By: Stewart C. Crawford, Jr., Esquire
Attorney Id. No.: 202188
55 N. Lansdowne Avenue
Lansdowne, Pa  19050
Telephone: (877)-992-6311
Web: www.crawfordlaw.us
E-Mail: scrawfordjr@subrolaw.us
Firm File No.H13-0040

*Attorney for Plaintiff, Frank Kwaning*

## IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA

### CIVIL ACTION-LAW

| | | |
|---|---|---|
| FRANK KWANING<br>4940 State Road<br>Drexel Hill, Pennsylvania 19026 | : | |
| | : | |
| | : | |
| | : | |
| Plaintiff, | : | IN CIVIL ACTION NO. |
| | : | |
| vs. | : | |
| | : | |
| COMMUNITY EDUCATION<br>CENTERS, INC. (a/k/a GEORGE W.<br>HILL    CORRECTIONAL FACILITY or<br>DELAWARE COUNTY PRISON)<br>35 Fairfield Place<br>West Caldwell, NJ 07006 | : | |
| | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |
| Defendant. | : | |

### NOTICE TO DEFEND

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this Complaint and notice are served, by entering a written appearance personally or by an attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are further warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the Complaint or for any other claim or relief requested by the Plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace faita asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma sus defensas o sus objectiones a las demandas en contra de su persona. Sea avisado que si usted no se defiende la corte tomara modidas puede continuar ila demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requiera que usted cumpla con todas las provisions de esta demanda. Usted puede perder dinero o sus propiedaces u otros derechos importantes para usted.

USTED DEBE LLEVAR ESTA AVISO A UN ABOGADO ENSESEQUIDA. SI USTED NO TIENE UN ABOGADO Y NO PUEDEPAGAR LOS SERVICIOS DE UN ABOGADO, DEBE COMUNICARSE CON LA SIGUIENTE OFICINA PARA AVERIGUAR DONDE PUEDE OBTENER AYUDA LEGAL.

**Lawyers' Referral Service**
**Front and Lemon Streets**
**Media, PA 19063**
**(610) 566-6625**

THE LAW OFFICES OF STEWART C. CRAWFORD & ASSOCIATES
doing business as CRAWFORD LAW
By: Stewart C. Crawford, Jr., Esquire
Attorney Id. No.: 202188
55 N. Lansdowne Avenue
Lansdowne, Pa 19050
Telephone: (877)-992-6311
Web: www.crawfordlaw.us
E-Mail: scrawfordjr@subrolaw.us
Firm File No. H13-0022

*Attorney for Plaintiff, Roslynn Simmons*

## IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA

### CIVIL ACTION-LAW

| | |
|---|---|
| ROSLYNN SIMMONS<br>310 Maypole Road<br>Upper Darby PA 19082 | : <br> : <br> : |
| Plaintiff, | : <br> : IN CIVIL ACTION NO. |
| vs. | : <br> : |
| COMMUNITY EDUCATION<br>CENTERS, INC. (a/k/a GEORGE W.<br>HILL   CORRECTIONAL FACILITY or<br>DELAWARE COUNTY PRISON)<br>35 Fairfield Place<br>West Caldwell, NJ 07006 | : $2015 - 000886$<br> : <br> : <br> : <br> : <br> : |
| | : <br> : JURY TRIAL DEMANDED |
| Defendant. | : |

## NOTICE TO DEFEND

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this Complaint and notice are served, by entering a written appearance personally or by an attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are further warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the Complaint or for any other claim or relief requested by the Plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plaza al partir de la fecha de la demanda y la notificacion. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma sus defensas o sus objectiones a las demandas en contra de su persona. Sea avisado que si usted no se defiende la corte tomara medidas ypuede continuar ila demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisions de esta demanda. Usted puede perder dinero o sus propiedaces u otros derechos importantes para usted.

USTED DEBE LLEVAR ESTA AVISO A UN ABOGADO ENSEGUIDA. SI USTED NO TIENE UN ABOGADO Y NO PUEDEPAGAR LOS SERVICIOS DE UN ABOGADO, DEBE COMUNICARSE CON LA SIGUIENTE OFICINA PARA AVERIGUAR DONDE PUEDE OBTENER AYUDA LEGAL.

**Lawyers' Referral Service**
**Front and Lemon Streets**
**Media, PA 19063**
**(610) 566-6625**

THE LAW OFFICES OF STEWART C. CRAWFORD & ASSOCIATES
By:  Stewart C. Crawford, Jr., Esquire
Attorney Id. No.: 202188
223 North Monroe Street
Media, Pa 19063
Telephone:  (877)-992-6311
Web: www.subrolaw.us
E-Mail: scrawfordjr@subrolaw.us
Firm File No.H13-0022

FILED

2015 JAN 30  PM 2: 47

OFFICE OF
JUDICIAL SUPPORT
DELAWARE CO. PA.

*Attorney for Plaintiff, Roslynn Simmons*

IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA

CIVIL ACTION-LAW

| | | |
|---|---|---|
| ROSLYNN SIMMONS<br>310 Maypole Road<br>Upper Darby PA, 19082 | : <br> : <br> : | |
| | : | IN CIVIL ACTION NO. |
| vs. | : <br> : | |
| COMMUNITY EDUCATION<br>CENTERS, INC. (a/k/a GEORGE W.<br>HILL  CORRECTIONAL FACILITY or<br>DELAWARE COUNTY PRISON)<br>35 Fairfield Place<br>West Caldwell, NJ 07006 | : <br> : <br> : <br> : <br> : <br> : | |
| | : | JURY TRIAL DEMANDED |
| Defendant. | : <br> : | |

## COMPLAINT

Plaintiff, Roslynn Simmons ("Plaintiff" or "Officer Simmons") by and through her

undersigned attorney, hereby alleges and states as follows:

## Parties

1.     Officer Simmons is an adult individual, residing at the above address.

Officer Simmons is employed by the defendant as a corrections officer.

2.     Upon information and belief, defendant, Community Education Centers,

Inc. a/k/a George W. Hill Correctional Facility or Delaware County Prison (the

1

"Employer" or the "Prison"), is a New Jersey business entity authorized to transact business in the Commonwealth of Pennsylvania. Defendant maintains a principal place of business at 500 Cheney Road, Thornton (Delaware County), PA 19373. Defendant is also subject to service of process in the jurisdiction pursuant to 42 Pa.C.S. Sec. 5322.

### Factual Allegations

1.   Plaintiff, Roslynn Simmons has worked at the George W. Hill Correctional facility as a corrections officer for more than fifteen years (i.e. since September 1998).

2.   Throughout that time, and through to the present day, Ms. Simmons has been involved with the corrections officer union as a representative where (as described below) she has been privy to the discriminatory employment practices of the prison. Officer Simmons is presently on the Executive Board of the Union. In her capacity as a union representative, Officer Simmons has heard in excess of 50 complaints of racial discrimination in the past year. She has urged each of the victims to make a formal grievance, however, more than 90% of those victims declined for fear of retaliation.

3.   Officer Simmons is also privy to the fact that the prison is dangerously overcrowded and that the Employer has made fraudulent misrepresentations to certain regulatory agencies concerning the sufficiency of training and staffing at the prison. It is believed by Officer Simmons that these misrepresentations were calculated to circumvent the maximum capacity of inmates at the prison for the purpose of earning more profits (i.e. the Employer is a private for profit prison). Thus, the Employer has intentionally overcrowded the prison and made misrepresentations concerning the resources available to handle that capacity.

4.   The overcrowding of inmates (and the corresponding misrepresentations) has directly and physically harmed Officer Simmons who, as a result, has contracted a

potentially fatal and infectious disease from the prison. Apparently, the prison has not properly inoculated incoming inmates and employees for Tuberculosis ("TB"), as required by law. As Officer Simmons understands it, the overpopulation of inmates has created a scarcity of TB inoculations. Notwithstanding this scarcity, the prison elected to allow inmates who were not inoculated to enter the general population creating the risk of spreading that disease to other inmates and guards such as Officer Simmons. The Employer even made financial arrangements during this time to house (for profit) Federal inmates and Philadelphia inmates (even when those inmates had no business with the County Court). In other words, not only did the Employer overcrowd the prison and misrepresent the training, personnel, and resources available to meet the demands of that overcrowding, but the Employer further chartered with other prison systems to house (for profit) certain of their inmates.

5.    A collective bargaining agreement controls (in part) the relationship between corrections officers and the employer. Importantly, that contract contains an anti-discrimination provision where the Employer warranted that it would not harass or discriminate against an employee on the basis of race. That collective bargaining agreement is not available for attachment to this complaint, however, defendant should already have it in its possession and or it is a matter of public record as it is attached to the Complaints of other recently terminated African American Officers.

6.    A progressive disciplinary policy exists within that collective bargaining agreement. Essentially, if disciplinary action is warranted, section 13.01 of the contract requires the employer to impose sanctions short of discharge or suspension (i.e. the employee can't be simply fired).

7.     Article 13.04 of the collective bargaining agreement, however, lists several exceptions to this progressive disciplinary policy that will allow the employer to bypass the progressive discipline requirement and immediately terminate or suspend the employee.  Unfortunately, section 13.04 is drafted ambiguously and in such a manner that allows any violation of a prison rule to be subjectively deemed a serious infraction warranting immediate dismissal (e.g., even minor infractions in a prison can be branded as serious security risks).

8.     The subjective application of sections 13.01 and 13.04 is one of the mechanisms used to discriminate against African American corrections officers who are disciplined and terminated for minor disciplinary matters while white corrections officers, who commit equivalent or even more serious violations, are permitted to be disciplined under the progressive disciplinary policy (when they are disciplined at all).

9.     The prison has about 400-500 corrections officers assigned to the George W. Hill correctional facility. In 2009, when CEC first assumed operations of the prison, approximately 80% of the corrections officers were African American. In 2013, less than 20% of the corrections officers are African American.

10.     In addition to discriminatory terminations, the hiring of African American employees is likewise subject to illegal discrimination. For example, the three hiring classes of new employees last summer (i.e. 2012) were primarily white. Indeed, out of approximately 36 new recruits only 3-6 were African American. Previously, the hiring classes were primarily employees of color.

11.     Moreover, white corrections officers who have been fired for cause from other institutions are hired by the prison to the exclusion of qualified African American candidates who had no such prior negative employment histories. For example, a

number of police officers who were fired in 2011 from various local townships for cheating on their re-certification examinations were hired at the prison, displacing qualified African American candidates.

12.     Certain white corrections officers have, for some reason, been granted pass codes to restricted computer files, allowing them unfettered access to e-mail and other confidential file materials such as employee records, employee disciplinary matters, and employee medical leave information. This type of privileged access to confidential personnel files is reserved only for supervisory staff, not corrections officers. No African American corrections officers have been privileged with this type of access.

13.     African American corrections officers are given a disproportionate number of write ups for being late; white corrections officers, who are likewise late, are not written up in the same manner. For example, when entering the secured building at the start of a shift, a bottleneck occurs as a multitude of officers must clear through security. The African American officers caught in that bottleneck are often written up whereas their white counterparts standing beside them are not.

14.     Importantly, a write up for lateness interferes with the ability to be promoted. Therefore, African American supervisors are disproportionately underrepresented in the prison and cannot achieve any meaningful progress with respect to correcting the prison's discriminatory practices.

15.     Similarly, African American corrections officers experience a disproportionate volume of work related speeding tickets as they attempt to rush to their posts to avoid this form of discipline.

15.     With respect to those writes up for being late, white supervisors would sometimes use their own personal watches as a basis for judgment rather than the

official prison time. Accordingly, African American officers were accused of being late in circumstances that were unwarranted. The intent of these white officers was to discipline African American corrections officers, regardless of whether or not those write ups was justified.

16.    African American corrections officers are disproportionately subjected to a "random" secondary search after passing through the pat down and ion scan. As noted above, all corrections officers must pass through security and are subjected to a pat down. As part of this screening process, random searches are conducted requiring corrections officers to be removed from roll call and escorted to a private room where another pat down occurs and the officers are forced to remove their shoes. Although the term "random" is employed, the selection process is not at all random; the majority of corrections officers selected for this secondary security search are African Americans notwithstanding the fact that African Americans now represent a minority share of the corrections officer population.

17.    African American female corrections officers are disproportionately subjected to a pat down when entering the facility. This is due to an erroneous perception by the white commanding officers that African American female corrections officers are carrying drugs and other illegal contraband for the African American prisoners with whom they have developed an inappropriate relationship. White female corrections officers do not suffer from that same perception and are accordingly not patted down.

18.    Essentially, the prison treats African American corrections officers with suspicion, suggesting that they illegally transport contraband for the prisoners. The prison does not cast the same degree of suspicion toward white corrections officers.

6

19.     This same unwarranted cloud of suspicion invades other aspects of the prison. For example, by the end of the summer 2012, all African American corrections officers were transferred out of Unit 10 and reassigned to other posts. Less qualified white corrections officers (some with as little as 6 months on the job) were assigned to replace those more experienced African American officers. Importantly, Unit 10 is the max unit, where the most dangerous criminal offenders are housed. This form of racial segregation not only violates the civil rights of the African American corrections officers but places those white rookie replacement at greater risk since Unit 10 not consist of les experienced officers.

20.     The perception amongst African American corrections officers is that African American supervisors are at higher risk of termination. This creates a disincentive to apply for management positions (i.e. there is greater job security to remain in the ranks with union protection rather than apply for a management position). Again, this contributes to the disproportionate dearth of African American supervisors and limits opportunities for African American corrections officer to earn higher wages.

21.     Certain white corrections officer recruits have clearly marked tattoos that reflect racially derogatory imagery and participation in white supremacist groups. The prison senior management turns a blind eye and does not require this form of racial depiction to be covered up while on duty.

22.     Importantly, intake officers are trained to identify the meanings of certain tattoos when processing inmates; such images are coded and stored in the computers. Thus, the prison is more than aware of the meaning of some of the racist imagery.

7

23.     White corrections officers freely use racial slurs and derogatory inferences when referring to African American prisoners. These racially motivated comments are made in front of African American corrections officers and include the use of the terms: nigger, monkey, coon, black motherfucker among other names.

24.     For example, a new recruit (a white officer) expressed in 2012 a racial animus during his initial training. He stated to his African American training officer that he "didn't like blacks." The African American training officer reported this to the Lieutenant in charge of training, a white person. No disciplinary actions were taken by the prison. Shortly thereafter, the white officer referred to a prisoner as a "nigger" in front of that training officer. Incredibly, the African American training officer (not the white corrections officer) was written up for the ensuing confrontation. Essentially, the African American training officer was disciplined for not ignoring these remarks.

25.     As noted above, the diversity dynamic was reversed dramatically beginning in 2009. The population of African American corrections officers dropped from 80% to 20%. In January 2009 in particular over 40 African American employees were terminated. These were contract employees (i.e. they could not be terminated). It became apparent that senior management was intentionally orchestrating an elimination of African American employees. Over the course of the next several months in 2009, another 40 African American employees were terminated. Thus, nearly 80 African American employees were terminated in the first five months of 2009.

26.     For example, the Lieutenant mentioned above, a member of Senior Management, would repeatedly sing a phrase "the boys are back in town" in situations where the diversity dynamic was implicated. This was interpreted as a clear reference to the replacement of African American officers with white officers.

27.     An African American corrections officer who was assigned to the K-9 unit and the CERT team (i.e. the prison equivalent of a SWAT team) was harassed on a perpetual basis until he went out on disability for emotional distress. He was the unit's only African American officer. A noose was left on his work locker as was a picture of a monkey. He was subjected to disparate treatment on a daily basis which included mockery of his African accent. This African American officer was further subjected to menial tasks in this unit, below those of his experience level. More seriously, this officer had his ankle broken intentionally during a CERT team training exercise, white officers who were harassing this officer intentionally jumped onto his ankle to cause him harm.

28.     A second African American corrections officer quit K-9 after enduring the same discriminatory harassment. Still another African American K-9 officer was physically assaulted (numerous times) by white members of the K-9 unit.

29.     As noted above, there is a disparity in the application of the progressive discipline policy. African American corrections officers are terminated for minor infractions that would have required a warning rather than suspension or termination. White corrections officers commit much more serious infractions and are given the benefit of the progressive discipline policy. For example, white corrections officers have inadvertently released prisoners on multiple occasions. These corrections officers are still employed and were never subjected to the just cause termination provision. African American corrections officers, however, are terminated for far less egregious offenses (e.g., delivering a message to a prisoner's family member, leaving a post for four minutes, leaving an internal door unlocked, exaggerating, etc.).

9

30.     In May of 2012, an African American corrections officer was instructed to cut her "afro" hair style. The reason provided for that instruction had nothing to do with safety or job performance, instead she was informed that her hair style was "too loud" and had afrocentric "symbolism." Previously, this same officer had dreadlocks and was instructed to cut them off because they too were too "symbolic" and were not "Eurpoean" enough.

31.     Similarly, in 2009, other African American employees were required to cut their dreadlocks. Two Rastafarian corrections officers were terminated for non-compliance. By contrast, at least one white woman who also had dreadlocks was neither disciplined nor terminated. No reasonable explanation was ever provided by the prison for why the dreadlocks were objectionable; the perception by African American employees is that Afro-centric appearances were being targeted. This perception was bolstered by the prisons contemporaneous prohibition of Muslim headwear.

32.     Further, white corrections officers with hair that proceeds beyond the neck line are not disciplined. For example, one white sergeant had a mullet and was not disciplined for the length of his hair.

33.     African American corrections officers are disciplined by white supervisors when they display facial hair even though it does not violate company policy. Moreover, white corrections officers displaying the same degree of facial hair are not reprimanded.

34.     On September 25, 2012, African American officers were forced to shave with prison issue razors or be sent home. White officers with similar length facial hair were told to come in the next day clean shaven (i.e. they were made to go home or shave onsite). Certain African American corrections officers cannot shave every day as it causes a skin irritation (i.e. bumps). White supervisors nevertheless write up those

10

officers and force them to shave on the spot with prison issue razors. The shaving issue is merely a pretext, the real purpose of the interaction is to harass and discipline African American corrections officers since white officers are neither written up nor compelled to shave onsite.

35.     An African American corrections officer who was elected to the role of president of the union received a photograph of herself with a noose drawn around her neck. This of course, is an historically discriminatory form of intimidation.

36.     In the summer of 2012 (around June or July), a African American corrections officer was soliciting tickets for some form of non-work event (e.g., bake sale, pretzel sale, etc). She was escorted off the grounds by the k-9 unit and disciplined. Around the same time, a white corrections officer was also soliciting tickets for some form of non-work event (e.g., mixed martial arts tournament). He was not disciplined; the white supervisors looked the other way. Moreover, white prison commanders actually purchased these tickets and attended his event.

37.     Two similar but unrelated incidents (one involving a white corrections officer the other a African American corrections officer) reflects the disparate treatment with respect to the progressive discipline policy. Around January 2012, both officers were arrested for criminal offenses at their residences. The charges against African American corrections officer were ultimately dropped, nevertheless he was not allowed back into the facility. The white corrections officer was not disciplined (and his offense involved a gun discharge). Moreover, the white corrections officer was actually bailed out of jail by a member of senior management.

38.    In December 2012, white corrections officers were permitted to call out without being charged sick time. African American corrections officers were never allowed this privilege.

39.    When President Barack Obama was first elected president, the prison surreptitiously changed a holidays from Presidents' day to Columbus Day. It was believed by African American corrections officers that this was done to protest the fact that the United States had elected a African American President. The prison changed the holiday back to Presidents' Day only when the union threatened to file a charge of discrimination with the EEOC.

40.    In 2012, an African American was hired to a management position. Other members of management (i.e. white members) were heard to say "Im not working with that nigger."

41.    The day to day operations are run by a cadre of white commanders/ assistant wardens. All told, there has been about 6-7 wardens over the last eleven years. As wardens come and go, these white senior managers enforce prison policy and essentially run the prison. Essentially, these white commanders who run the prison are the source of the discrimination problems, both directly and indirectly (for allowing the bigotry to fester and become part of the prison infrastructure). Consequently, no racial discrimination problems can be meaningfully resolved since all complaints begin and end at the desk of these white senior managers. No racial discrimination problems can be meaningfully resolved since all complaints begin and end at the desk of these white senior managers.

12

42.     It is even believed that these white commanders have intentionally sabotaged the appointment of certain wardens, causing their removal by allowing inspection violations to be detected (i.e. the warden is the person ultimately responsible for any violations).

43.     The corporate offices have no oversight and have seemingly abandoned the prison; leaving it to be mismanaged from within. Even the human resources department is dysfunctional; it had no hiring and firing responsibilities. Instead all personnel decisions come from the 5-6 senior managers. Overt disparaging references to African Americans by a county official with oversight of the prison further indicate a tacit approval and complicacy of the discrimination.

44.     In January 2012, a union representative drive to CEC corporate offices in New York City and informed them personally of the mismanagement at the prison and of the racial discrimination. No corrective action was ever taken.

45.     In the Fall of 2012, union representatives (including Officer Simmons) provided a Vice President of the corporation with a list of instances of mismanagement at the prison and of the racial discrimination. No corrective action was ever taken. In fact, the corporate vice president was invited by the union representatives to come see the conditions for himself; he declined citing the fact that an assistant warden (a subordinate employee to that vice president) informed the vice president that he wasn't required to go on that kind of tour. Essentially, the corporation refused to hear the complaints of racial discrimination.

46.     As noted above, qualified African American job applicants are not sleeted for employment but lesser qualified white employment candidates are selected.  When qualified applicants are interviewed (if selected to be interviewed in the first place) they

13

are routinely informed that further background checks are required and sent home never to be recalled. White applicants are signed up immediately with no additional background checks.

47.     In addition to racial profiling with respect to hiring, the training and testing provided is lax and ineffective, allowing unqualified officers to pass into the prison ranks without being identified. The absence of adequate training is one of the primary problems contributing to the discriminatory culture.

48.     The testing is also meaningless, there is nearly a 99% pass rate; unqualified people are most certainly not flushed out and not instructed about how to properly carry out prison policy.

49.     All told, perhaps as little as 8 hours of mandatory training actually occurs. The instructors falsify the training reports to make it appear as if the full four hours was performed. Moreover, no meaningful diversity training is ever provided; instead, the only thing that occurs is a reading of the prison's diversity statement. No workshops or guidelines on diversity are ever provided. Thus, there is a direct correlation between the lack of training and the mistreatment of African American officers and prisoners.

50.     As noted above, the misdeeds of white corrections officers are rarely addressed. If they are, the white corrections officers are given the benefit of the progressive disciplinary policy whereas the African American officers are disciplined under Article 13.04. For example, on May 12, 2012 a white corrections officer threw a punch at an African American corrections officer. Despite a report of this incident to senior management no investigation ever occurred and no discipline ever took place. Note, this attempted assault occurred in an area where cameras from in-house DVR

system had captured footage; in other words, it was a verifiable incident that was never investigated.

51.     Several months after this incident, on August 31, 2012, that same white officer was scheduled in the same unit and on the same shift as the African American corrections officer. The white officer informed his supervisors that he intended to "get into it" with the African American officer. The prison's solution to this issue was to move the African American officer (a more experienced officer) to a less desirable station. Incredibly, the African American officer was disciplined for insubordination when he protested being placed in a less desirable duty. The African American officer grieved this situation to the warden. The prison never addressed it.

52.     The disparate application of the progress disciplinary policy isn't even a secret. White members of Senior Management routinely threaten to write people up for cause (i.e. under Article 13.04) to address minor issues. Importantly, if someone truly violated Article 13.04 discipline, a warning or threat would not be appropriate. Warnings are reserved for 13.01 acts. Essentially, senior management is knowingly taking warning situations but suggesting that they have the authority to indiscriminately choose to bring charges under 13.04. As noted above, it is precisely the vagaries of this contractual language that have allowed senior management to fulfill their illegal agenda of eliminating African Americans from employment. Management refers to it as a "write up game."

53.     Recently, it was determined by a counselor that the prison would be more harmonious if the cells were segregated according to race. No empirical data was used to justify that racial conclusion, it was just the belief of the counselor and Senior

management. Importantly, the cell segregation had the effect of denying African American prisoners certain jobs that were preferential and higher paying.

54.     When an African American corrections officer complained of this racial segregation policy, he was removed from that post.

55.     When concerns with discriminatory or disparate treatment are voiced, they were met with ridicule and obstinacy. Prison management never resolve these issues.

56.     In June or July of 2012, pictures were discovered on work computers portraying black persons with exaggerated nostrils; an historically discriminatory image.

57.     An African American supervisor in the medical unit was essentially framed by white superiors and ultimately compelled to quit. This former employee (i.e. a doctor) was the prison medical director and witnessed his entire staff of 10-12 black employees be systematically reduced to only one black employee. This doctor himself was then targeted by white superiors and accused of being drunk on the job (even though an alcohol test proved negative).

58.     When a white sergeant is disciplined, it is for particularly egregious offenses (e.g. rape, assault, etc.). Even then, the suspension is short lived. For example, one sergeant was suspended for only two days for the use of excessive force which resulted in to the hospitalization of an African American prisoner. African American employees are never treated with this form of forgiveness for disciplinary acts; in fact, African American employees are held to a much higher standard of scrutiny and must conduct themselves nearly perfectly lest they be terminated immediately for minor infractions.

59.    A white sergeant was convicted of aggravated assault and sentenced to serve weekends in Chester County Prison. He was neither terminated nor disciplined.

60.    This same white sergeant on another occasion stated to an African American officer "where's your colored ass working?" This comment was made in front of other African American. One African American officer filed an incident report and handed it to a member of senior management; no action was ever taken by the prison.

61.    White employees who have DUI's are not disciplined. African American officers who similarly have DUI's are terminated.

62.    In 2010, an inmate reported that money was stolen from him at intake. A white officer and an African American officer both handled that money. The African American officer was terminated notwithstanding the lack of evidence. The white officer was not disciplined.

63.    On April 9, 2013 a random car check occurred. 6 weapons were found in the respective vehicles of two white officers. No disciplinary action was taken. A few years ago in a similar search, a single BB gun was found in the trunk of a vehicle. The two African American officers riding together in that vehicle were both terminated including the passenger who had no access to the trunk or knowledge that a BB gun existed.

64.    On April 4, 2013, a white corrections officer misplaced a prison weapon for nearly 45 minutes. A few years ago, an African American officer misplaced a bullet after it became inadvertently lodged in his clothing and was terminated.

65.    On February 3, 2010, an assistant warden was overheard by African American corrections officers as saying "the only black people working here are the ones that I allow"

17

66.     African American officers are not only discouraged from taking the exam for a supervisor position, but even when they do they are blackballed or disqualified for other reasons. At least two African American sergeants had two take the examination nearly thirty times each. The vast majority of those times they passed the test.

67.     White corrections officers, on the other hand, are often given the examination content or questions in advance to facilitate their passing. Essentially, they are provided with an unfair advantage.

68.     On February 21, 2013 a white corrections officer worked a triple shift (nearly 24 hours straight) in violation of the work rules. He was not disciplined. In 2010, an African American officer worked a similar shift (although one of those shifts was spent at home resting as vacation). The African American officer was disciplined.

69.     In May 2012, an African American officer was terminated for leaving a control room in the medical unit for only four minutes to check on unsupervised inmates and to check on a schedule (with the permission of her sergeant). In October 2012, a white corrections officer left the entire wing against the protests of his African American Sergeant. The ensuing write up was not only discarded by senior management but the white officer was praised by white senior management. Essentially, an African American officer was terminated while a white officer wasn't even disciplined for the same offense.

70.     On September 26, 2012 a white corrections officer used the word "nigger" in front of an African American officer. That African American officer reported the incident to senior management who took no disciplinary action. In fact, senior management stated "he is just expressing himself." Ultimately the warden intervened

18

and disciplined the white officer; had the warden not discovered this incident senior management would have permitted it to exist.

71.     In 2011-2012 A long tenured white employee passed away. The flags were lowered in his honor. Around the same time a long tenured African American employee similarly passed away; when the flags were lowered in his honor they were ordered to be raised again. The understanding is that this disparate treatment was racially motivated.

72.     One of the assistant wardens, a member of the cadre of white senior management intentionally ignores African American officers whom he passes in the hallway. His treatment of white employees is markedly different; he will engage in small talk and general cordiality. With African Americans, however, he will demonstratively refrain from making eye contact or any communications. Sometimes he will even pretend to be making telephone calls to avoid communications with African American officers (even though the phone has been observed to be upside down). He does not treat white employees with the same degree of disdain. When the Complainant inquired about the grounds for this rudeness he replied "I don't have to speak to you."

73.     On April 9, 2013, that same assistant warden interfered with the representation of a union member during a "random" drug test. Essentially, that assistant warden misrepresented to the African employee that he was not entitled to have a union representative present during the drug test. Moreover, that employee (who passed his drug test) believes that the test was not at all random, rather he was selected as a result of his African origins which sometimes produce bloodshot eyes during certain environmental conditions. Complainant was the union representative for that African employee; the assistant warden made her repeatedly re-read a provision to the collective bargaining agreement that clearly revealed that a union representation was a right of an

19

employee during a drug test. Despite this clear language, the assistant warden made Complainant repeatedly re-read it as if the language would somehow change.

74.    In September 1998, that same assistant warden (a captain at the time) injected himself into a conversation between Officer Simmons and another African American employee concerning the origins of the town of Ridley. The assistant warden (who lived in Ridley) took offense to the suggestion that Ridley was named after a prominent African American.  The following day. Complainant provided to the assistant warden written proof of the origins of the African American origins of Ridley Township. He balled it up on and threw it on the floor then forced Complainant to clean it up. When Complainant protested cleaning up his mess the assistant warden proclaimed" your days are numbered here"

75.    On February 3, 2010 that same assistant warden was overheard by African American employees speaking to another officer. He stated "the only black people working here are the ones that I allow". The African American officers who overheard this took offense and reported it to Complainant. Importantly, that assistant warden seemingly has the final say on all new hires.

76.    It is the understanding of African American corrections officers (such as the Complainant) that the above mentioned assistant warden was asked to resign a prior position as a Colwyn police officer due to race related problems.

77.    On April 9, 2013, a random search of employee vehicles yielded six unauthorized weapons on prison grounds found within vehicles owned by two white officers. Neither of the two white correction officers were disciplined. Conversely, a few years ago a similar search yielded a solitary BB gun in the trunk of an African American officer. Both he and his African American passenger (another corrections officer who

was carpooling to work that day) were terminated immediately. Corrections officers such as Complainant perceive this to be yet another example of the disparate application of the disciplinary policy.

78.     At the end of March (beginning of April) 2013 a black sergeant filed an EEOC complaint concerning disciplinary action for having turned down a voluntary assignment. Essentially, the two African American sergeants who turned down the assignment were disciplined, however, a white sergeant who similarly turned it down was not. Importantly, the voluntary assignment represented an upgrade in duties without a corresponding upgrade in pay (i.e. they would still be paid sergeants pay for lieutenants work). Moreover, another African American sergeant had been requesting that voluntary assignment for nearly five years to aid him in learning the lieutenant's position. He was continually denied that opportunity.

79.     That same ambitious African American sergeant that kept putting in for the voluntary lieutenant's work was actually blackballed from becoming a sergeant multiple times. In fact, he took the sergeants examination over 30 times and passed on at least 26 occasions but was continually denied advancement. White corrections officers have very little difficulty making sergeant. Examination questions are presented to them in advance, answer are provided to them, they are allowed to advance to sergeant short of the required times on the job.

80.     The seniority of other African American sergeants are often disregarded as white sergeants are promoted to lieutenant ahead of those African American sergeants. Similarly, the seniority of African American sergeants is disregarded in applying for certain shifts (e.g., first shift). Still other means of disrespecting African American sergeants is evident in the fact that nearly all are assigned to a floater position rather

21

than have a permanent assignment on a unit (i.e. they perception is that African American sergeants cannot be trusted to work a unit as a permanent fixture.

81.    On April 4, 2013, a white officer lost a prison issued weapon. He was not disciplined. African American corrections officers have been disciplined for far less egregious mistakes. Moreover, an African American officer was blamed for a bullet that was misplaced and immediately terminated. The white officer lost an entire weapon.

82.    In 2012, a white officer took issue with Officer Simmons decision to vote for an African American president (i.e. Obama).

83.    On September 26, 2012 a white officer called a female African American officer a "nigger." She reported it but was informed that he is "just expressing himself" and he was not disciplined by senior management. Only when the warden discovered this was he disciplined; but for that fact senior management had no issue with the use of that term.

84.    The prior corporation to run the prison had diversity workshops, the present corporation (i.e. Community Education Centers, Inc.) does not.

85.    The Complainant has made repeated written requests to corporate concerning mistreatment and discrimination. The Complainant has made repeated verbal complaints to sergeants, lieutenants, and the union. No corrective action has ever occurred. The discriminatory and hostile environment continues.

86.    In 2010, corporate was informed of the complaints of at least four corrections officers concerning racial mistreatment. No meaningful corrective measures were ever implemented.

87.    On September 21, 2012, the Union President (an African American corrections officer) learned that the prison administration was making

22

misrepresentations to other prospective employers concerning the disciplinary records of African American employees. In other words, African American corrections officers couldn't even transfer out of the prison.

88.     Someone at the prison has retaliated against persons who speak out about the wrongs at the prison. A victim of sexual harassment who filed an EEOC charge discovered her tires slashed and car scratched. Similarly, the Unions first African American was vocal about the abuses at the prison, she too had her tires slashed.

89.     As noted above, a corrections officer drove to company headquarters in early 2012 to report racial abuses. Yet another corrections officer did the same thing in 2011-2012 by driving to the address listed on her paystub. She was re-directed to another address by the postal service.

90.     On August 15, 2012, a white officer was given warnings (his second warning) for the same offense where African American officers had been immediately terminated.

91.     At least two white corrections officers had called out sick in excess of 20 days last year (only 7 sick days are permitted). No system is enforced to regulate these call outs. Although these officers were paid for work not performed, they were not disciplined. Rather they were promoted (one to sergeant and the other to the CERT team. Meanwhile, two African American officers who had legitimate reasons to exceed the 7 days sick (and properly reported the fact that they had exceed the allotted sick time) were denied the opportunity to be a CERT member under the guise that a CERT team member had to be on call at all times.

92.     On January 10, 2012, Complainant overheard a number of white senior management making fun of the weight and walk of an overweight diabetic corrections officer. They referenced her limp and the fact that she must eat several times a day.

93.     On January 10, 2012, a white supervisor was caught with contraband (i.e. a tobacco product). He was written up but it was later taken away. Another white supervisor had been caught before with the same contraband several times but was not disciplined. Conversely, an African American corrections officer was terminated for having M&Ms and another was disciplined for having sunflower seeds.

94.     The white kitchen manager treats the African employees and African American inmate workers in a disgraceful manner, not permitting them to take regular bathroom breaks. At least one African American urinated himself as a result. On April 21, 2013 an African American defecated on himself or nearby in the kitchen as a result of not being permitted to take a bathroom break. The treatment of the white employees is markedly different and respectful.

95.     Two standards of treatment of prisoners exist at the prison, one for white prisoners and one for prisoners of color. African American employees, such as Officer Simmons, must bear witness to this additional form of racial mistreatment in the workplace.

96.     In November 2012, two white sergeants beat an African American prisoner so severely that the prisoner required emergency treatment and hospitalization off premises (rather than in the prison hospital). The beating was unprovoked and occurred in the prisoner's cell (where he posed no threat to anyone). It was so bad that the prisoner was begging for the white supervisors to stop beating him and begging for his mother. The two supervisors had no good reason to be in the African American

24

prisoner's cell at that time; they went there for the purpose of tormenting that prisoner. A third white corrections officer whose job it was to videotape the encounter, intentionally turned the camera away from the assaults.

97.    Those two white supervisors had previously beaten other prisoners in this manner, even prisoners who were handcuffed at the time.

98.    Those two white sergeants were never subjected to the immediate termination provision of Article 13.04, instead they were disciplined under the progressive discipline policy of Article 13.01. In fact, shortly after their two day suspension they were each rewarded with a first shift, a desirable shift in the prison, one they had each requested prior to this incident.

99.    In November 2012, in another incident in, one of these same white Sergeants was involved in another assault of an African American prisoner; he punched the inmate in the mouth and knocked out some of his teeth then remarked that since he is a crack addict he would probably lose his teeth anyway. This white sergeant then bragged about this incident as well.

100.    White corrections officers have illegally planted drugs and other contraband on African American prisoners.

101.    Still more egregious offenses have been observed on a regular basis, offenses that likely qualify as hate crimes and human rights violations. For example, at intake, a special cell referred to as the "dirty cell" is maintained where rotten food, human feces, and human urine are sealed within the cell. African American inmates (rather than white inmates) are subjected to this cell by white corrections officers who think it is funny.  African American inmates were sometimes exposed to this health hazard for as long as 20 hours; until someone on the next shift would free them. The cell

25

has no sink nor any toilet. There is only a hole in the floor but it is covered with a grate so any defecation cannot pass through the grating. Food is slid into this cell and often intermingles with the fecal matter.

102.   Importantly, other "clean" cells are a available; this particular cell was maintained in this unhealthy condition intentionally. White inmates were never observed in this cell, notwithstanding the fact that the inmate population is diverse (i.e. it is not mostly African American).

103.   A similar cell is maintained in the medical unit.

104.   African American inmates (not white inmates) are also subjected to frigid cells (i.e. blow freezing) with no blankets

105.   White corrections officers deny phone calls to African American inmates.

106.   In 2010, another African American prisoner (a Federal inmate) was targeted for being African American. The prisoner was not being rowdy nor threatening. His head was bumped into door jams by white officers until he suffered a brain injury requiring hospitalization. Excessive use of force, such as these two examples, occurred on a regular basis and was disproportionately more severe with African American prisoners. Aside from the racially motivated beatings, the discipline imposed on the white supervisors was not the same discipline that would have been imposed on African American officers had the circumstances been reversed, as noted before, African American officers are terminated for far less serious offenses (e.g., leaving a post for 4 minutes, passing message to a prisoners family, dozing on the job, etc.).

107.   White corrections officers use the heads of African American prisoners to open heavy doors resulting in brain injury. Indeed, a prisoner will be carried by guards and they will use his head to open the door; sometimes the prisoners heads are

intentionally bumped into immovable objects such as walls and door jams. This is a regular occurrence.

108.    White sergeants and corrections officers will intentionally enter a cell to physically assault African American inmates. It happens regularly on second and third shifts.  These white assailants are over heard saying things such as "lets treat" the inmate. Some of these inmates were restrained at the time of the assaults.

109.    White corrections officers will alter reports to justify excessive use of force on African American prisoners. For example, white corrections officers will allege that African American prisoners spit on an officer or performed some other undetectable or unverifiable act warranting physical restraint when no such initial physical action by the prisoner occurred. Instead, the catalyst is normally something less serious such as attitude from the prisoner or a funny look.  In other words, a white corrections officer might perceive some demeanor or attitude of the prisoner that is not appreciated so the white corrections officer overreacts and responds with the use of force (more often excessive force) and then lies on the report about the incident.

110.    Notably, corrections officers are given training on how to be deceitful in a written report (i.e. how to write something in a manner that will exonerate any wrongdoing by the corrections officer). In addition to receiving training on how to describe illegal acts in a manner that seemingly exonerates any wrongdoing by the corrections officer, supervisors would edit and cleanse these reports, often without the knowledge of the reporting officer.

111.    K-9 officers allow the dogs to urinate on the belongings and bedding of African American prisoners during searches of cells.  This mistreatment did not happen to white prisoners.

112.    The corporation running the prison had an African American employee fielding grievances form inmates. This employee was replaced by a white employee. Significantly, the number of prisoner complaints somehow dropped from 200-300 per years to about 25 per year.  Apparently, the white employee was not properly forwarding prisoner complaints.

113.    White corrections officers overuse pepper spray, essentially painting African American prisoners. The protocol calls for minimal use of thee spray.  In fact, the overuse of the spray can be verified by comparing the number off incidents where spray was documented to the supply and ordering of the spray by the prison. The prison now orders gallon containers rather than smaller containers. Again, this is the product of racial animus since the spray is disproportionately directed to African American prisoners. It is also the product of lack of training and oversight.

114.    In some instances, a prisoner is already subdued (e.g. handcuffed) when a white sergeant will grab him by the back of his hair, pull his face upward the spray, and paint his face with spray until the prisoner vomits. Even after vomiting, the white sergeants continues to spray the face of the inmate. Essentially, the prisoner is water boarded with pepper spray.  Notably, the spray employed cautions against indoor use and ingestion.

115.    African American prisoners are disproportionately denied access to counselor services which has an adverse impact on their participation in special programs such as boot camp.

116.     White inmates are given preferential treatment. For example, weekend inmates who are white are often permitted to stay in medical and bring books and televisions and make phone calls.  No African American inmate was ever given such perks.

117.     Other instances of discrimination, retaliation and harassment occurred continuously throughout each year of Plaintiff's employment. The Employer should have documents in its possession further reflecting this continued mistreatment (e.g. hiring and firing records, disciplinary records, grievance records, investigative records, etc.).  Other corrections officers (as well as the Union) may likewise have corroborating evidence reflecting what Complainant and others have had to endure, provided they are not too fearful to come forward.

118.     Like other African American corrections officers, Officer Simmons believes that his status as an African American employee meant that he enjoyed less job security than similarly situated white corrections officers.  This perception of unequal employment rights and opportunities is pervasive amongst African American employees. It has a chilling effect on the motivation of employees such as Officer Simmons to seek advancement within the company.

119.     Accordingly, Officer Simmons filed on May 3, 2013 a charge of discrimination and retaliation with the Pennsylvania Human Relations Commission (along with other regulatory entities).

120.     On May 6, 2013, a newspaper article published the fact that Officer Simmons had filed a claim for discrimination. Although Officer Simmons was not identified by name in the article, sufficient information was provided in that article to

29

trace the identity of the Charge to Officer Simmons alone (e.g. the fact that she is a female who had been there since 1998 and sits on the executive Board of the Union).

121.    In June 2013, while at work one day, prison investigations approached Officer Simmons and made the unusual comment "we are watching you...the camera is on you"

122. On or about Friday, September 6, 2013, Officer Simmons was engaged at work in counseling a fellow corrections officer (in a meeting with human resources). This was part of Officer Simmons' union responsibilities. An assistant warden walked past Officer Simmons, then turned around and walked back to observe Officer Simmons. This walking back and forth occurred at least four times in less than eight minutes and was designed to make his presence known to Officer Simmons (i.e. he is watching her).

123.    In addition to this unwarranted scrutiny, the assistant warden also directed the unusual comment "0-4" to Officer Simmons. Officer Simmons soon learned the following Monday at a union meeting that the phrase "0-4" apparently refers to Officer Simmons' attorney in her PHRC filings. Indeed, senior management at the prison had developed some misguided understanding at the time that Officer Simmons' attorney's win to loss ratio was 0-4 concerning representing African American employees; those members of senior management have been heard to say to others at the prison "Crawford is 0-4". The assistant warden's comment, therefore, is a direct reference to Officer Simmons PHRC filing; a suggestion that she will not prevail.

124.    Officer Simmons understands this comment and the unwarranted scrutiny from the assistant warden to be directly related to her PHRC filings; part of a large pattern of retaliation and intimidation for filing the above referenced PHRC charges.

30

## COUNT I- DISCRIMINATION
(Plaintiff vs. Defendant Employer)

125.    Plaintiff repeats and re-alleges all of the foregoing paragraphs as well as all of the following paragraphs, as if they were set forth herein at length.

126.    The Defendant has discriminated against, the Plaintiff because of her race in violation of 43 P.S. 951 et.seq., the Pennsylvania Human Relations Act prohibiting discrimination in employment.

127.    As a direct and proximate result of this conduct, Officer Simmons suffered damages. The Employer is liable for those damages.

WHEREFORE, Plaintiff demands judgment in excess of $50,000, for the aforementioned damages, in addition to interest from the date of the loss, the costs of this lawsuit, certain administrative costs, attorney fees, punitive damages, and whatever additional relief the Court may deem proper.

## COUNT II- UNJUST ENRICHMENT
(Plaintiff vs. Defendant Employer)

128.    Plaintiff repeats and re-alleges all of the foregoing paragraphs as well as all of the following paragraphs, as if they were set forth herein at length.

129.    The Employer received a financial benefit from Officer Simmons reluctance to seek a higher paying supervisor position.

130.    The Employer accordingly was unjustly enriched at the expense of Officer Simmons.

131.    Officer Simmons seeks equitable disgorgement of that enrichment.

WHEREFORE, Plaintiff demands judgment in excess of $50,000, for the aforementioned damages, in addition to interest from the date of the loss, the costs of

31

this lawsuit, certain administrative costs, attorney fees, punitive damages, and whatever additional relief the Court may deem proper.

## COUNT III –BREACH OF CONTRACT
### (Plaintiff vs. Defendant Employer)

132.    Plaintiff repeats and re-alleges all of the foregoing paragraphs as well as all of the following paragraphs, as if they were set forth herein at length.

133.    The Employer breached the collective bargaining agreement.

134    As a direct and proximate result of this breach, Officer Simons suffered damages. The Employer is liable for those damages.

WHEREFORE, Plaintiff demands judgment in excess of $50,000, for the aforementioned damages, in addition to interest from the date of the loss, the costs of this lawsuit, certain administrative costs, attorney fees, punitive damages, and whatever additional relief the Court may deem proper

## COUNT IV –BREACH OF WARRANTY
### (Plaintiff vs. Defendant Employer)

136.    Plaintiff repeats and re-alleges all of the foregoing paragraphs as well as all of the following paragraphs, as if they were set forth herein at length.

137.    The Employer breached certain warranties and promises in the collective bargaining agreement.

138    As a direct and proximate result of this breach, Officer Simons suffered damages. The Employer is liable for those damages.

139.    It is anticipated that the defendant will object to this cause of action as they have recently done in similar matters. Please note, this Court (in two separate matters before two separate judges) has already recognized the validity of this specific

cause of action in relation to this very same defendant and this very same collective bargaining agreement.

WHEREFORE, Plaintiff demands judgment in excess of $50,000, for the aforementioned damages, in addition to interest from the date of the loss, the costs of this lawsuit, certain administrative costs, attorney fees, punitive damages, and whatever additional relief the Court may deem proper

### COUNT V- NEGLIGENCE
(Plaintiff vs. Defendant Employer)

140.   Plaintiff repeats and re-alleges all of the foregoing paragraphs as well as all of the following paragraphs, as if they were set forth herein at length.

141.   The Employer had a duty to protect its employees and prisoners from harm (including infectious diseases, racial discrimination, & retaliation). This included a duty of supervision.

142.   The Employer breached various duties (including engaging in fraudulent and/or negligent misrepresentation with respect to the TB inoculations) resulting in personal injury and emotional distress to Officer Simmons.

143.   The Employer is liable for those damages.

WHEREFORE, Plaintiff demands judgment in excess of $50,000, for the aforementioned damages, in addition to interest from the date of the loss, the costs of this lawsuit, certain administrative costs, attorney fees, punitive damages, and whatever additional relief the Court may deem proper

### COUNT VI- GROSS NEGLIGENCE
(Plaintiff vs. Defendant Employer)

144.   Plaintiff repeats and re-alleges all of the foregoing paragraphs as well as all of the following paragraphs, as if they were set forth herein at length.

145.   The Employer had a duty to protect its employees and prisoners from harm (including racial discrimination retaliation). This included a duty of supervision. The Employer consciously disregarded the reported acts of discrimination allowing the human rights of African American employees and prisoners to be severely compromised. This level of negligence exceeded ordinary negligence.

146.   The Employer breached various duties resulting in harm to Officer Simmons.

147.   The Employer is liable for those damages.

WHEREFORE, Plaintiff demands judgment in excess of $50,000, for the aforementioned damages, in addition to interest from the date of the loss, the costs of this lawsuit, certain administrative costs, attorney fees, punitive damages, and whatever additional relief the Court may deem proper

## COUNT VII- NEGLIGENCE PER SE
(Plaintiff vs. Defendant Employer)

148.   Plaintiff repeats and re-alleges all of the foregoing paragraphs as well as all of the following paragraphs, as if they were set forth herein at length.

149.   The Employer actions violated certain statutes and regulations that were designed to prevent the harm that ensued.

150.   The Employer breached various duties and violated those laws resulting in harm to Officer Simmons.

151.   The Employer is liable for those damages.

WHEREFORE, Plaintiff demands judgment in excess of $50,000, for the aforementioned damages, in addition to interest from the date of the loss, the costs of

this lawsuit, certain administrative costs, attorney fees, punitive damages, and whatever additional relief the Court may deem proper

## COUNT VIII- STRICT LIABILITY
(Plaintiff vs. Defendant Employer)

148.    Plaintiff repeats and re-alleges all of the foregoing paragraphs as well as all of the following paragraphs, as if they were set forth herein at length.

149.    The resultant losses and damages sustained by Plaintiff resulted directly and proximately from the actions of the defendant who is strictly liable for failing to properly administer infectious disease inoculation and for failing to warn the ultimate users and consumers (i.e. employees, inmates, their families, and the public with who they come into everyday contact) defective condition in that:

(a)     the defendant is engaged in the business of distributing, selling, and administering products such as the TB Vaccination;

(b).    the defendant failed to vaccinate the inmates and employees;

(c).    Failing to properly regulating infectious diseases within the prison population (including TB) creates a risk to the welfare of inmates, employees, and the public at large and therefore represents an ultra hazardous activity

(d).    the defendant failed to take adequate remedial measures, warn, refrain from admitting inmates, or otherwise prevent the hazard from causing damages also made the pison with the defective condition unreasonably dangerous;

150.    The Employer is liable for those damages.

35

WHEREFORE, Plaintiff demands judgment in excess of $50,000, for the aforementioned damages, in addition to interest from the date of the loss, the costs of this lawsuit, certain administrative costs, attorney fees, punitive damages, and whatever additional relief the Court may deem proper

## COUNT IX- HOSTILE WORK ENVIRONMENT
### (Plaintiff vs. Defendant Employer)

151.    Plaintiff repeats and re-alleges all of the foregoing paragraphs as well as all of the following paragraphs, as if they were set forth herein at length.

152.    The Defendant has discriminated against, the Plaintiff because of her race in violation of 43 P.S. 951 et.seq., the Pennsylvania Human Relations Act prohibiting discrimination in employment.

153.    As a direct and proximate result of this conduct, Officer Simmons suffered damages. The Employer is liable for those damages.

WHEREFORE, Plaintiff demands judgment in excess of $50,000, for the aforementioned damages, in addition to interest from the date of the loss, the costs of this lawsuit, certain administrative costs, attorney fees, punitive damages, and whatever additional relief the Court may deem proper.

## COUNT X- HOSTILE WORK ENVIRONMENT
### (Plaintiff vs. Defendant Employer)

154.    Plaintiff repeats and re-alleges all of the foregoing paragraphs as well as all of the following paragraphs, as if they were set forth herein at length.

155.    The defendant has retaliated against the Plaintiff due to her actions and protestations concerning the discrimination cited above. These actions violate 43 P.S. 951 et.seq., the Pennsylvania Human Relations Act prohibiting discrimination in employment.

156. The Employer owes damages as a result of these actions.

WHEREFORE, Plaintiff demands judgment in excess of $50,000, for the aforementioned damages, in addition to interest from the date of the loss, the costs of this lawsuit, certain administrative costs, attorney fees, punitive damages, and whatever additional relief the Court may deem proper.

Stew Crawford, Jr., Esq.

*Counsel for Complainant*

## VERIFICATION

I hereby verify, swear and affirm that the statements contained herein are true and correct to the best of Plaintiff's knowledge, information and belief. I understand that false statements herein are made subject to the penalties of 18 PA.C.S. Section 4904, relating to unsworn falsification to authorities.


By: _Rosalyn Simmons_ 9/9/14 _____
      Rosalynn Simmons


Dated:

# NOTICE

**Pennsylvania Rule of Civil Procedure 205.5. (Cover Sheet) provides, in part:**

### Rule 205.5.   Cover Sheet

(a)(1)   This rule shall apply to all actions governed by the rules of civil procedure except the following:

> (i)      actions pursuant to the Protection from Abuse Act, Rules 1901 et seq.

> (ii)     actions for support, Rules 1910.1 et seq.

> (iii)    actions for custody, partial custody and visitation of minor children, Rules 1915.1 et seq.

> (iv)     actions for divorce or annulment of marriage, Rules 1920.1 et seq.

> (v)      actions in domestic relations generally, including paternity actions, Rules 1930.1 et seq.

> (vi)     voluntary mediation in custody actions, Rules 1940.1 et seq.

(2)      At the commencement of any action, the party initiating the action shall complete the cover sheet set forth in subdivision (e) and file it with the prothonotary.

(b)      The prothonotary shall not accept a filing commencing an action without a completed cover sheet.

(c)      The prothonotary shall assist a party appearing pro se in the completion of the form.

(d)      A judicial district which has implemented an electronic filing system pursuant to Rule 205.4 and has promulgated those procedures pursuant to Rule 239.9 shall be exempt from the provisions of this rule.

(e)      The Court Administrator of Pennsylvania, in conjunction with the Civil Procedural Rules Committee, shall design and publish the cover sheet.  The latest version of the form shall be published on the website of the Administrative Office of Pennsylvania Courts at www.pacourts.us.



DAVID STEWART
STEWART CONST.
55 W. Lona
Lansdowne, PA

RETURN SERVICE
REQUESTED

FIRST CLASS

Community Education Centers Inc
35 Fairfield Place
West Caldwell, NJ 07006

7014 0510 0000 8784 9644

U.S. POSTAGE
NEWTON, PA
19063
JAN 30, 15
AMOUNT
$8.24
0007-5874-08

07006
300C